UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| SUSAN HASSETT, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 09-12034-MLW |
| | ) | |
| ELISABETH HASSELBECK, et al., | ) | |
| Defendants. | ) | |

<u>MEMORANDUM AND ORDER</u>

WOLF, D.J.                                          December 3, 2010

I.  INTRODUCTION

On November 30, 2009, <u>pro se</u> plaintiff Susan Hassett filed a complaint alleging copyright infringement by defendants Elisabeth Hasselbeck and Center Street Hachette Book Group ("Center Street") (collectively, "defendants"), as well as by an unidentified ghostwriter (referred to in the complaint as John Doe). Hassett alleges that she is the author of a book entitled <u>Living with Celiac Disease</u> ("<u>Living</u>"), for which she obtained a copyright in March, 2008. She alleges that she mailed a copy of <u>Living</u> to Hasselbeck on April 4, 2008. She alleges that, on or about May 4, 2009, Center Street published and distributed <u>The G Free Diet</u> ("<u>G Free</u>"), a book written by Hasselbeck and the ghostwriter. She alleges that <u>G Free</u> contains actual copying of and is substantially similar to <u>Living</u>. As clarified at the November 30, 2010 hearing, her claim is based in part on a theory she terms "compilation copyright," meaning, essentially, that Hasselbeck broke <u>Living</u> down

1

into its constituent facts, ideas, and phrases, made changes to the text, and then distributed these elements throughout G Free in a different order and arrangement. Hassett seeks damages and injunctive relief.

Defendants are moving for summary judgment on the ground that there is not substantial similarity between G Free and Living. Hassett is moving for leave to proceed in forma pauperis, for appointment of counsel, for a preliminary injunction prohibiting defendants from distributing or promoting G-Free, and for an order compelling defendants to identify the alleged ghostwriter, John Doe.

The court has thoroughly reviewed the works in questions, as well as Hassett's lists of purported similarities.  As discussed below, the court concludes that, after the unprotected elements of Living are identified and removed from consideration, a rational factfinder, correctly applying the pertinent legal standards, would be compelled to conclude that no substantial similarity exists between Living and G Free.  Accordingly, defendants' motion for summary judgment is being allowed.  All other pending motions are moot.

The court recognizes that Hassett worked hard and under difficult circumstances to assemble the facts and ideas included in Living.  Yet even if defendants appropriated some of these facts

and ideas and incorporated them in a new work,[1] they are not liable to Hassett.  This may appear unfair to Hassett.  However, this perceived unfairness is not an unforeseen byproduct of the copyright law, but "is, rather, the essence of copyright and a constitutional requirement." See Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 349 (1991)(internal citations and quotation marks omitted).  "[C]opyright assures authors the right to their original expression, but encourages others to build freely upon the ideas and information conveyed by a work." Id. at 349-50. "'The very object of publishing a book on science or the useful arts is to communicate to the world the useful knowledge which it contains.  But this object would be frustrated if the knowledge could not be used without incurring the guilt of piracy of the book.'" Id. at 350 (quoting Baker v. Selden, 101 U.S. 99, 103 (1880)).  Consequently, to paraphrase the Supreme Court, great praise may be due to Hassett for her industry and enterprise in publishing her book, which may be of great utility to those suffering from celiac disease.  See id. at 364.  The law does not, however, authorize her to be rewarded in the manner she requests. See id.

II.  PROCEDURAL HISTORY

On November 30, 2009, Hassett, appearing pro se, filed the

---

[1]Defendants deny that they had access to Living and that any copying occurred.  See Mem. in Support of Mot. to Dismiss at 6 n.6.  These questions are not presently before the court.

instant complaint, in which she asserts three counts of copyright infringement, one against each defendant.  See Compl. at 5-8.

On August 2, 2010, defendants moved to dismiss the complaint due to a lack of substantial similarity.  In connection with this motion, defendants submitted various exhibits, including a copy of G Free and a copy of Living.  Hassett opposed dismissal, in part on the ground that the version of Living submitted with defendants' motion was the 2009 copyright version (the "2009 edition"), whereas the complaint refers to the 2008 copyright version (the "2008 edition").  In an October 14, 2010 Order, the court converted defendants' motion to dismiss to a motion for summary judgment pursuant to Federal Rule of Civil Procedure 12(d).  The court ordered the parties to submit all material pertinent to such a motion by November 1, 2010, and scheduled a hearing on the motion for summary judgment for November 30, 2010.  Since that time, Hassett has expanded the record by filing the 2008 edition of Living, as well as an additional list of purported similarities.

III.  LEGAL STANDARDS

A. Summary Judgment

The court's discretion to grant summary judgment is governed by Federal Rule of Civil Procedure 56. Rule 56 provides, in pertinent part, that the court may grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show

there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In addition, the facts are to be viewed in the light most favorable to the non-moving party. <u>Woods v. Friction Materials, Inc.</u>, 30 F.3d 255, 259 (1st Cir. 1994). "When a party fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party bears the burden of proof at trial, there can no longer be a genuine issue as to any material fact . . . and the moving party is entitled to judgment as a matter of law." <u>Smith v. Stratus Computers, Inc.</u>, 40 F.3d 11, 12 (1st Cir. 1994).

In determining the merits of a motion for summary judgment, the court is compelled to undertake two inquiries: (1) whether the factual disputes are genuine, and (2) whether any fact genuinely in dispute is material. <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 247-48 (1986). "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." <u>Id</u>. To determine if the dispute about a material fact is "genuine," the court must decide whether "the evidence is such that a reasonable [fact finder] could return a verdict for the non-moving party." <u>Id</u>.; <u>see also</u> <u>Medina-Munoz v. R.J. Reynolds Tobacco Co.</u>, 896 F.2d 5, 8 (1st Cir. 1990); <u>Oliver v. Digital Equip. Corp.</u>, 846 F.2d 103, 105 (1st

5

Cir. 1988).   Under this analysis, the evidence relied upon must be admissible.   See Vazquez v. Lopez-Rosario, 134 F.3d 28, 36 (1st Cir. 1998).

   B.  Copyright Infringement: Substantial Similarity

   The plaintiff bears the burden of proving the two elements of copyright infringement: "'(1) ownership of a valid copyright[;] and (2) copying of constituent elements of the work that are original.'"   See Johnson v. Gordon, 409 F.3d 12, 17 (1st Cir. 2005)(quoting Feist, 499 U.S. at 361).   To establish copying, a plaintiff must show actual copying and substantial similarity.   Id. at 18 (citing Segrets, Inc. v. Gillman Knitwear Co., 207 F.3d 56, 60 (1st Cir. 2000)).   Actual copying is shown by direct or circumstantial evidence, including evidence of access coupled with probative similarity.   See id.   Substantial similarity is shown by "proof that the copying was so extensive that it rendered the works so similar that the later work represented a wrongful appropriation of expression."   Id. (citing Yankee Candle Co. v. Bridgewater Candle Co., 259 F.3d 25, 33 (1st Cir. 2001)).   A plaintiff's failure to show substantial similarity entitles a defendant to judgment.   See Yankee Candle, 259 F.3d at 33, 37 (affirming summary judgment based on lack of substantial similarity where validity of the copyright was undisputed and actual copying was assumed).[2]

_____

   [2]Because Hassett is a pro se litigant, the court construes her complaint and other filings liberally.   See Donovan v. Maine, 276 F.3d 87, 94 (1st Cir. 2002).   However, even if pro se,

Substantial similarity is measured by the ordinary observer test, which provides that "two works will be said to be substantially similar if a reasonable, ordinary observer, upon examination of the two works, would 'conclude that the defendant unlawfully appropriated the plaintiff's protectable expression.'" See T-Peg, Inc. v. Vermont Timber Works, Inc., 459 F.3d 97, 112 (1st Cir. 2006)(quoting Johnson, 409 F.3d at 18)). The volume of similar material is not necessarily dispositive, as the fact that "the copying involved only a small portion of the plaintiff's work does not by itself make the copying permissible." Situation Mgmt. Sys., Inc. v. ASP Consulting LLC, 560 F.3d 53, 59 (1st Cir. 2009). "Indeed, even if the similar material is quantitatively small, if it is qualitatively important, the trier of fact may properly find substantial similarity."[3] Id. Additionally, "'[s]light or trivial variations between works will not preclude a finding of infringement under the ordinary observer test.'" Segrets, 207 F.3d at 65 (quoting Concrete Mach. Co. v. Classic Lawn Ornaments, Inc., 843 F.2d 600, 608 (1st Cir. 1988)). An artist may avoid

---

Hassett is "obligated to comply with what the substantive law require[s]." Edwards v. New England Tel. and Tel. Co., 86 F.3d 1146, at *1 (1st Cir. 1996)(table).

[3]The First Circuit has noted that commentators view de minimis copying, meaning copying of insufficient length to create substantial similarity, "as relating to instances of fragmented literal similarity, applicable only where no more than a line, or a paragraph, or a page or chapter of the copyrighted work has been appropriated." Situation Mgmt., 560 F.3d at 59 n.2 (internal quotation marks omitted).

infringement "'by intentionally making substantial alterations in the design of a copyrighted work so as to provide a substantially different expression of the idea embodied in the copyrighted work,'" but only if "'the points of dissimilarity not only exceed the points of similarity, but indicate that the remaining points of similarity are (within the context of plaintiff's work) of minimal importance either quantitatively or qualitatively.'" Id. at 65-66 (quoting Concrete Mach., 843 F.2d at 608).

Importantly, however, the examination for substantial similarity "must focus on 'what aspects of the plaintiff's work are protectible under copyright laws and whether whatever copying took place appropriated those protected elements.'" Johnson, 409 F.3d at 19 (quoting Matthews v. Freedman, 157 F.3d 25, 27 (1st Cir. 1998)); see T-Peg, 459 F.3d at 112. "[O]nly the 'protected expression' is relevant to an evaluation of substantial similarity." Yankee Candle, 259 F.3d at 33-34. Thus, an impression of overall similarity will not establish substantial similarity if the "impression flows from similarities as to elements that are not themselves copyrightable." Johnson, 409 F.3d at 19.

For this reason, a court evaluating substantial similarity must recognize and apply certain limits on the scope of copyright protection. See id. "Copyright law protects original expressions of ideas but it does not safeguard either the ideas themselves or banal expressions of them." See id.; Yankee Candle, 259 F.3d at 33

8

("[I]deas cannot be copyrighted . . . ." (internal quotation marks omitted)); <u>Dunn v. Brown</u>, 517 F. Supp. 2d 541, 544-45 (D. Mass. 2007)(Ponsor, J.); <u>see also</u> 17 U.S.C. §102(b)("In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work."). Under the merger doctrine, even the expression of an idea is unprotected "when there is only one way to express a particular idea." <u>Coquico, Inc. v. Rodriguez-Miranda</u>, 562 F.3d 62, 68 (1st Cir. 2009). Although a particular selection and arrangement of facts may be "thin[ly]" protected, the facts themselves are not. <u>See</u> <u>Feist</u>, 499 U.S. at 348-49. Under the doctrine of <u>scenes a faire</u>, there is no protection for "elements of a work that are for all practical purposes indispensable, or at least customary, in the treatment of a given subject matter." <u>Coquico</u>, 562 F.3d at 68. Additionally, "copyright law denies protection to fragmentary words and phrases and to forms of expression dictated solely at functional considerations." <u>CMM Cable Rep, Inc. v. Ocean Coast Props., Inc.</u>, 97 F.3d 1504, 1519 (1st Cir. 1996)(internal quotation marks omitted)(holding short, clichéd phrases conveying the idea of employment were not protected because, among other reasons, they did not involve an appreciable amount of text or the minimal creativity necessary to warrant copyright protection); <u>see</u> <u>Johnson</u>,

9

409 F.3d at 24 (holding that the phrase "You're the One for Me" did not warrant copyright protection); see also Matthews, 157 F.3d at 28.

The process of identifying the unprotected elements of a work and removing them from consideration is sometimes called "dissection analysis." See Yankee Candle, 259 F.3d at 34. "In performing the substantial similarity analysis, a court should be careful not to over-dissect the plaintiff's work, causing it to ignore the plaintiff's protectable expression." Situation Mgmt., 560 F.3d at 59 (citing CMM, 97 F.3d at 1515 (stating that the court must be aware of the danger of "so dissect[ing] the work as to classify all its elements as unprotectable[,] thereby possibly blinding [the court] to the expressiveness of their ensemble." (internal quotation marks and ellipses omitted))). "[T]he court should not lose sight of the forest for the trees; that is, it should take pains not to focus too intently on particular unprotected elements at the expense of a work's overall protected expression." Coquico, 562 F.3d at 68.

"Summary judgment on substantial similarity is 'unusual' but can be warranted on the right set of facts." T-Peg, 459 F.3d at 112 (quoting Segrets, 207 F.3d at 62). "'Summary judgment on substantial similarity is appropriate only when a rational factfinder, correctly applying the pertinent legal standards, would be compelled to conclude that no substantial similarity exists

between the copyrighted work and the allegedly infringing work." Id. (quoting Johnson, 409 F.3d at 18); see also Quaglia v. Bravo Networks, No. 06-1864, 2006 WL 3691667, at *1-2 (1st Cir. Dec. 15, 2006)(affirming summary judgment where no reasonable juror could find substantial similarity because the similar elements were either insubstantial or not subject to copyright protection).

IV. DISCUSSION

At the outset, the court notes that both the 2009 edition and the 2008 edition of Living are in the record and are referred to in the briefing.  The complaint relates only to the 2008 edition. Although Hassett originally took issue with the defendants' submission of the 2009 edition of Living, she now takes the position that the 2008 edition and the 2009 edition have "exactly [the] same text."  See Hassett Decl. at 1.  She states that the only differences between the two versions are that the 2009 edition has numbered pages, corrects some spelling errors, and has a different copyright date and ISBN number.  See id. at 2.  Hassett states that she, in fact, submitted pages from the 2009 edition to the court in her exhibits.  See id.  Consequently, as agreed by the parties at the November 30, 2010 hearing, any differences between the 2009 edition and the 2008 edition are immaterial to the substantial similarity analysis.  Because the 2009 edition has numbered pages, the court will cite to that version for the sake of clarity.

The sole question before the court is whether a rational factfinder, correctly applying the pertinent legal standards, would be compelled to conclude that no substantial similarity exists between <u>Living</u> and <u>G-Free</u>. <u>See</u> <u>T-Peg</u>, 459 F.3d at 112. The court finds that a rational factfinder would be compelled to conclude that no substantial similarity exists because any similarities arise out of elements of <u>Living</u> not protected by copyright law. Therefore, the motion for summary judgment is being allowed.

Both <u>Living</u> and <u>G Free</u> are self-help books designed to assist people who have celiac disease. As one would expect, and as Hassett demonstrates through her exhibits, there are similarities between the two works. Both books, for example, list the symptoms of celiac disease (many of which are included in both books) and describe the particular symptoms experienced by the respective authors. <u>Compare</u> <u>Living</u> at 24-35, <u>with</u> <u>G Free</u> at 4-10, 16-17. Both works include lists of foods and other products likely to contain gluten. <u>Compare</u> <u>Living</u> at 60-67, 70-72, <u>with</u> <u>G Free</u> at 35-50. Both offer ideas to avoid contact with gluten in everyday life. <u>Compare</u> <u>Living</u> at 36-41, <u>with</u> <u>G Free</u> at 63-94. Both discuss problems related to children with celiac disease. <u>Compare</u> <u>Living</u> at 42-44, <u>with</u> <u>G Free</u> at 145-59. Both discuss a possible link between gluten consumption and autism. <u>Compare</u> <u>Living</u> at 42, <u>with</u> <u>G Free</u> at 199-205. Both note that children with Down syndrome are at increased risk for developing celiac disease. <u>Compare</u> <u>Living</u> at

43, with G Free at 32.  However, even if these similarities create

an impression of overall similarity, they will not establish

substantial similarity if the "impression flows from similarities

as to elements that are not themselves copyrightable."  Johnson,

409 F.3d at 19.  After reviewing the similarities submitted by

Hassett, the court finds that the similarities arise out of ideas,

facts, individual words or short phrases, and aspects of the works

customary to the genre, none of which are copyrightable.  See Part

III(B), supra (collecting cases).  Once these unprotected elements

are excised, a reasonable factfinder could not find substantial

similarity.

   A.  Unprotected Ideas

   Many of Hassett's purported similarities arise out of

similarity of ideas, which are not protected by copyright law.  See

Feist, 499 U.S. at 348-49; Johnson, 409 F.3d at 19.  For example,[4]

Living includes the following passage:

      Overtime you purchase a new product even if you have

---

      [4]Hassett has submitted many examples of purported
similarities, mostly in the form of individual sentences or
fragments of sentences.  The examples discussed in this Order
are, in the court's view, among the most favorable to Hassett.
The court has not further fragmented the examples presented by
Hassett.  See Johnson, 409 F.3d at 25 (noting that the district
court did not engage in impermissible "[h]yper-dissection" when
it did not further fragment the similarities presented by the
plaintiff's expert).  Indeed, the court presents its analysis
using larger blocks of text than those presented by Hassett in
order to discuss the purportedly similar material within the
wider context of the two works.  See id.  In quotes from Living,
all spelling and grammar errors are in the original text.

used it before you should still call and make sure it is gluten free.  The reason being sometimes manufacturers will change the starch in a product and not change the label on the product or the label on the box that the product came out of.  Call the company and ask for it in writing again and again and again if you have to. . . . Remember to always tell them that you have celiac and you have zero tolerance for gluten so you may not even have trace amounts.  Also make sure they can identify where all the starches in a product are derived from.  Also ask if it has been packaged on a belt where products containing wheat have been packaged.  As well as has the belt been Cleaned in between packaging.

Living at 38-39.[5]  Similarly, G Free states:

Step 3: Call back periodically.  Yes, it sounds like a hassle, but "better safe than sorry" is your new mantra, and following up with companies can pay off. Call back every so often to make sure any once-questionable foods are still gluten-free.  Companies frequently change their manufacturing sites or acquire a new brand without altering their product labels.  If you are buying chips, cereal, or any other grain-based food from a major company, you want to check that the product is not only G-free, but processed in G-free facilities as well.  A corn chip could be riding down a clean conveyor belt one week, and dusted with wheat cracker residue the next.  Even if you've been G-free for years, you may want to do these follow-ups on a regular basis.

G-Free at 76-77.

These passages embody a similar idea - the idea that a person with celiac disease should contact manufacturers from time to time to verify that gluten-free foods are still made without gluten and in a location that is not contaminated by wheat products.  Beyond that idea, which is unprotected, the passages have a few individual words in common ("call" "belt" "label" "wheat"), but are otherwise

_____

[5]Elsewhere on page 38 of Living, Hassett also writes that "the belt a product is packaged on could contain wheat."

essentially dissimilar.  For example, <u>Living</u> discusses the failure to change a product label after changing the starch in a product, while <u>G Free</u> discusses such a failure in the context of acquiring a new brand or shifting manufacturing facilities.  <u>Living</u> discusses the possibility that a conveyor belt is contaminated, whereas, in <u>G Free</u>, it is the corn chip that becomes contaminated rather than the belt.  <u>Living</u> emphasizes requesting written confirmation, while <u>G Free</u> does not.  The differences between these two passages are not the sort of slight or trivial variations which would permit a finding of substantially similarity.  <u>See Secrets</u>, 207 F.3d at 65. Rather, it is the points of similarity that are both qualitatively and quantitatively unimportant.  <u>See id.</u>

As another example, in <u>Living</u>, Hassett writes:

> Do not ever "double dip" This means use one knife for your butter, one for your condiments.  If your knife is dirty get another one.  For celiac's with severe cases that one crumb in your jelly could be your last.

<u>Living</u> at 40.  Similarly, in <u>G-Free</u>, Hasselbeck writes:

> It's important to label your spreads, too, so that family members know not to stick their crumb-encrusted knives in there.  As with everything else in our kitchen, the entire family is welcome to all of my foods, but I have a strict policy against double-dipping - I will have your head if I see any breadcrumbs in my peanut butter or jelly!

<u>G Free</u> at 67-68.[6]  Again, the passages embody a similar idea - the

---

[6]On page 81 of <u>G Free</u>, Hasselbeck also notes that: "Butter is G-free, too, as long as you keep it away from crumb-contaminated knives!  Ditto for margarines, creams, pure mayonnaises, and nut butters."

idea that a person with celiac disease should avoid gluten by keeping contaminated knives away from gluten-free spreads and jellies.  However, beyond that unprotected idea, the passages are essentially dissimilar except for the use of a few individual words in both ("double-dip[ping]" "jelly").

As a third example, in Living, Hassett writes:

> When sending your child to school, always pack your child a lunch.  Make sure you go over celiac information with the teacher and the lunchroom people at the beginning of each school year.  You might tell the teacher to come up with a signal when your child needs to use the bathroom because sometimes-celiac children must use the bathroom more frequently than other children.

Living at 44.[7]  Similarly, in G Free, defendants state:

> At the start of each and every school year, you need to walk your child's teacher through the minutiae of a gluten-free diet.  Make sure that the teacher understands the seriousness of the diet, and the potential consequences of not following it.

G Free at 154; see also id. at 156 (suggesting meeting with "as many different people as possible - teachers, administrators, cafeteria staffers, and of course, your child's classmates and their parents").[8]  These passages both express a similar idea - the idea that, when a child has celiac disease, it is helpful to talk to staff at the school at the outset of every school year in order

---

[7]On page 43 of Living, Hassett also writes: "Try to make your child's illness common knowledge for family members, teachers, doctors, friends the school nurse anyone who has contact with your child."

[8]G Free also discusses working with cafeteria staff to establish an allergy-friendly menu on page 157.

to ensure that the child is not exposed to gluten.  Beyond that idea, however, the passages are essentially dissimilar except for a few individual words or short phrases ("school year" "teacher" "make sure").

As a fourth example, Hassett writes, in a section on avoiding gluten when receiving inpatient medical treatment:

> So the day of my surgery first did the soap that
> they make you wash with, does have gluten.  Next, the
> soap they wash the pajamas you wear for the surgery
> because you can break out from that.  Next, is the rubber
> gloves are you allergic to latex?  I am, so that, needed
> to be addressed.  Next is the IV bag what are they
> putting in it you need to know that every ingredient has
> not even a trace amount in it, if something with a trace
> amount of gluten in it was put in a needle an shot into
> my vein I know I would die.  I call my Mother the gluten
> warden and I told all the hospital staff you have to get
> through the gluten warden to get to me.  After everything
> we have been through, we check everything.

Living at 73.  Hasselbeck titled a section (directed at the companions of people with celiac disease) "Quality 3. Candor: Be a Gluten Guard" and writes:

> People with celiac disease must ultimately learn how
> to speak up for themselves and tell others - friends,
> waiters, in-laws - what they can and can't eat.  But that
> does not mean you can't also speak up on their behalf
> every once in a while. . . . Sometimes, I will go into a
> restaurant on a mission, giving the waiter a long lecture
> on the life-or-death importance of keeping any gluten-
> contaminated items off my plate. . . . On other days,
> exhaustion sets in, and I won't feel like launching into
> yet another superdetailed explanation of my diet.  I
> simply want to sit back in my chair like a normal person
> and order like everyone else for a change.  On those
> nights, Tim has become a pro at advocating for me
> (especially when I am pregnant). . . . He will basically
> fill in the blanks of all the advisories I should be
> giving every time I sit down at a restaurant.  Two

advocates are better than one!

G Free at 163.  Hasselbeck also refers to a "wingman" and "gluten guard" in a section about dining at weddings.  See id. at 119. Again, the ideas here are similar - the idea that a person with celiac disease will be helped if a family member prevents gluten exposure at difficult moments.  Beyond that, the expression is different.  Hassett talks about a "gluten warden," while Hasselbeck talks about a "gluten guard" or "wingman."  Hassett's discussion is focused on the hospital setting, while Hasselbeck's is directed at dining out.  The similarities are minimal.

Because these similarities arise out of unprotected ideas, they cannot, as a matter of law, demonstrate substantial similarity.  See Johnson, 409 F.3d at 19.  For example, in 1998, in Duffy v. Penguin Books USA Inc., the District Court for the Southern District of New York granted a defendant's motion for summary judgment where two works expressed similar ideas through dissimilar expression.  See 4 F. Supp. 2d 268, 273-275 (S.D.N.Y. 1998).  In Duffy, plaintiff wrote books relating "to style and fashion for large sized women."  See id. at 270-71.  Plaintiff's book articulated a system of four categories, labeled H, O, A, and X, to describe a woman's body.  Id. at 273.  Defendant's book addressed a similar topic and used four similar categories, albeit without the same labels.  Id. at 273.  The court held that there was not substantial similarity because "the idea that women's

18

bodies come in one of four types is not copyright protectable."
See id. The court explained that such an idea is "a common one
that [defendant] and others are free to build upon, although not to
express in precisely the same manner as [plaintiff]." Id. Here,
just as in Duffy, defendants were free to express ideas about
techniques to avoid ingesting gluten, provided that they did not do
so in the same manner as Hassett.   See id.; see also LaPine v.
Seinfeld, No. 08-128, 2009 WL 2902584, at *8 (S.D.N.Y. Sept. 10,
2009)(holding, in a case involving similar cookbooks for parents,
that the idea of hiding vegetables in foods children enjoy is not
copyrightable).

    B.  Unprotected Short Phrases

    Other purported similarities offered by Hassett are short
phrases, which are not protected by copyright law. See Johnson,
409 F.3d at 24; CMM, 97 F.3d at 1519.

    For example, Hassett writes:

        A person with celiac disease should only shop in the
    outer isles of the supermarket.  The reason being the
    only thing down the other isles is things you can't have.
    So why torture yourself.  Especially if you just find out
    you have the disease.

Living at 37.  Hasselbeck, in a section called "Naturally G-Free
Foods," writes:

        The foods on the outer aisles of the supermarket
    should be the foundation of your diet - of any diet,
    really, with or without gluten.  Basic, natural foods
    that have kept humans going since long before the
    invention of sliced bread....

<u>G Free</u> at 78.  The ideas expressed by the two passages are somewhat different - Hassett's idea is that people with celiac disease should never shop in certain parts of the supermarket due to the presence of gluten-containing products, while Hasselbeck's idea is that foods in certain parts of the supermarket are generally healthier and should constitute a large part of every person's diet.  The passages are similar, however, because both contain the phrase "the outer [isles/aisles] of the supermarket."  "It is axiomatic that copyright denies protection to 'fragmentary words or phrases," in part because they do not "involve an appreciable amount of text or the minimal level of creativity necessary to warrant copyright protection."  <u>See</u> <u>CMM</u>, 97 F.3d at 1519, 20.  Consequently, the single similarity between the two passages should be excluded, leaving only dissimilar material.

As another example, Hassett writes:

> Osteoporosis - After years and years of having celiac disease I have osteoporosis.  Have a bone density test.  If you have celiac disease this is a must, demand it from your doctor.  Believe me they won't do it if you don't ask.  The longer misdiagnosed or not diagnosed the more severe it becomes.  The damage is not reversible it is permanent.  Also, take Magnesium with calcium one works with the other.

Living at 31.  Hasselbeck writes, in her section captioned "Osteoporosis":

> If you are not absorbing calcium, vitamin D, and other essential nutrients over a long period of time, your bones might become weak and brittle, which could lead to osteoporosis and other skeletal problems, including recurrent fractures and osteopenia.

20

> Osteoporosis - which can cause pain and fractures of the
> spine, hip, and other bones - is a fairly common side
> effect of untreated celiac disease.  In fact, roughly 75
> percent of recently diagnosed celiacs have some degree of
> bone loss.  Luckily, you <u>can</u> protect yourself against
> osteoporosis, even if you spent many years searching for
> the right diagnosis.  Talk to your doctor about getting
> your bone density tested.  Depending on the results, you
> might need to supplement your gluten-free diet with
> calcium, magnesium, and vitamin D.  Exercise also really
> helps rebuild bone mass.

<u>G Free</u> at 26.  Most of the similarities between these passages are

unprotected medical facts - such as the fact that osteoporosis is

caused by prolonged celiac disease, and the fact that calcium and

magnesium supplements are used to treat osteoporosis.  The passages

also share an unprotected idea - the idea that people with celiac

disease will probably benefit from being tested and treated for

osteoporosis.  Beyond these unprotected ideas and facts, the only

significant similarity of expression is the phrase "bone density

test[ing]," a short phrase excluded from copyright protection.

As a third example, Hassett writes:

> Don't be discouraged if you do not get everything
> right the first time out of the gate.  The saying "Rome
> wasn't built in a day" definitely applies when you have
> celiac disease.  Relapses do happen; a sad reality about
> the disease is that every time you have a relapse you go
> back to square one.  Every time this happens it becomes
> harder each time for our immune system to catch back up
> with are bodies.  This is life threatening because our
> organs can eventually fail.

<u>Living</u> at 36.[9]  Hasselbeck, in her section on cooking for a family,

---

[9]Hassett also includes the phrase "Rome Wasn't Built in a
Day" without any context on page 22 of <u>Living</u>.

writes:

> Tip 1: Rome Wasn't Built in a Day!
>
> A celiac disease diagnosis can come as a major shock
> - especially to your family members.  Your condition will
> dramatically change <u>all</u> of your lives no matter what, so
> you have a lot to gain by making your family's transition
> as smooth as possible.  Though you may have to overhaul
> <u>your</u> diet overnight, your family members might need a
> little more time to adjust.  Give them that time, opting
> for gradual modifications over harsh, all-or-nothing
> measures.  Teach them about your new diet, and as you
> learn new tricks of the trade, include them in both your
> triumphs and your flops.  Just don't expect instant
> compliance with your G-free lifestyle.

<u>G Free</u> at 100.  The ideas expressed are different - Hassett's idea
is that celiac sufferers may make mistakes when adjusting their
diet or relapse to an inappropriate diet, while Hasselbeck's idea
is that a celiac sufferer who cooks for a family should try to
introduce the new diet to family members incrementally.  Beyond
that, the expression is different except for the phrase "Rome
wasn't built in a day."  This cliché is not copyrightable.  <u>See
Johnson</u>, 409 F.3d at 24.

C.   <u>Unprotected Facts</u>

In addition to unprotected similarities arising out of ideas
or short phrases, other similarities between the books arise out of
unprotected facts.  "[T]he facts contained in existing works may be
freely copied because copyright protects only the elements that owe
their origin to the compiler - the selection, coordination, and
arrangement of facts."  <u>Feist</u>, 499 U.S. at 359.  However, "[n]ot
every selection will pass muster."  <u>Id.</u> at 358.  Rather, a

22

protected selection or arrangement must display a minimal level of creativity, unlike (as in <u>Feist</u>) the alphabetical listing of names in a telephone book. <u>See</u> <u>id.</u> at 358-59, 362-63.

As an example of the exclusion of fact from copyright protection, in 1998, in <u>DeBitetto v. Alpha Books</u>, the District Court for the Southern District of New York dismissed a claim of copyright infringement arising out of books about medical care for dogs because, even if actual copying occurred, the books lacked substantial similarity. <u>See</u> 7 F. Supp. 2d 330, 334, 336 (S.D.N.Y. 1998). The court noted that, even though the books in question "address[ed] many of the same topics and rel[ied] on many of the same underlying facts," these similarities were primarily the result of unprotected elements, "including statements of scientific or medical fact or procedures for caring for a dog." <u>See</u> <u>id.</u> at 334. For example, although both books discussed mange and roundworm in passages the court termed "undeniably similar," the passages were not substantially similar for infringement purposes because the facts about these parasites were not protected and because the passages were organized differently and used different tone and style. <u>See</u> <u>id.</u> Even where a list of poisons was virtually identical, the court found that there was no infringement because "[t]he list of poisons is the sort of list likely to be found in any book of pet care" and thus lacked sufficient originality to be protected based on the selection and arrangement

23

of facts.  See id. at 334-35 (citing Feist, 499 U.S. at 344-49).

Here, as in DeBitetto, there are similarities in fact that cannot, as a matter of law, justify a finding of substantial similarity.  For example, both Living and G Free list the symptoms of celiac disease.  Compare Living at 24-26, with G Free at 16-18. Some symptoms are listed in both books.  See e.g., Living at 24 ("miscarriages");  G Free at 17 ("Infertility, spontaneous miscarriages").  However, the similarities between the two passages arise out of elements that are not copyrightable.  First, the symptoms themselves are facts and are not, therefore, protected. See Feist, 499 U.S. at 359.  Second, the selection of facts is not identical, nor is the selection of symptoms of celiac disease for inclusion in a book about celiac disease sufficiently original to justify protection.  See Feist, 499 U.S. at 362-63 (holding selection of people subscribing to telephone service for inclusion in telephone book was not original); DeBitetto, 7 F. Supp. 2d at 334-35 (holding selection of poisons in pet book was not original). Third, the arrangement of facts is not at all similar - Hassett lists all the symptoms together, seemingly at random, while Hasselbeck divides the symptoms into two groups (possible symptoms and long term conditions), arranges them alphabetically, and includes commentary.  When the unprotected similarity is excised,

no protected similarity remains between these two lists.[10]

Both Living and G Free also list foods and other products that do and do not contain gluten. Compare Living at 60-72, with G Free at 35-47. Information regarding whether a food or product contains gluten is an unprotected fact, and there cannot, therefore, be substantial similarity just because both works state as fact that products like instant coffee, communion wafers, and envelope adhesive sometimes contain gluten. See Feist, 499 U.S. at 359. Additionally, the selection and arrangement of the facts in the works is very different. In Living, Hassett first lists a number of "word[s] that should bring up red flags," each with a short explanation. See Living at 60-65. The list, which is not organized alphabetically, includes the names and descriptions of various products containing gluten, including food products, food additives, hygiene products, and miscellaneous products like communion wafers and envelopes. See id. Hassett next presents a list of "things that can bother a severe case of celiac disease," which is not in alphabetical order and which includes, for example, cigarette smoke, gasoline fumes, and floral arrangements. See id. at 66. Hassett then presents a list of "[g]rains to avoid," again

_____

[10]In addition to these lists, both books also feature explanations of some of the symptoms. Compare Living at 27-35, with G Free at 25-32. The selection and arrangement of symptoms in this additional discussion is not particularly similar, nor is the text used in the descriptions. See e.g., Living at 31, 34 (osteoporosis, infertility, miscarriages), G Free at 26, 27 (same).

not in alphabetical order. <u>See</u> <u>id.</u> at 67-68. She then presents a list of "gluten free flours" in apparently random order. <u>See</u> <u>id.</u> at 68. Hassett next presents a conversion chart for using alternative flours in recipes that call for wheat flour. <u>See</u> <u>id.</u> at 69. Lastly, she presents, in alphabetical order, a "forbidden list" naming, but not describing, foods and food ingredients containing gluten. <u>See</u> <u>id.</u> at 70-72.

In contrast, in <u>G Free</u>, Hasselbeck presents some of the same facts but organizes the presentation differently. She first presents a list of gluten-free foods.[11] <u>See</u> <u>G Free</u> at 34. Hasselbeck next presents a listing of different varieties of wheat in alphabetical order, each with a short description. <u>See</u> <u>id.</u> at 35-37. In boxes set apart from the main text, she lists alternative names for wheat and wheat flour in alphabetical order. <u>See</u> <u>id.</u> at 38-39. She then covers several other grains and starches that either do or might contain gluten, in each case including some brief discussion of the grain and various products in which it might be used. <u>See</u> <u>id.</u> at 37-40. Hasselbeck then lists, in alphabetical order, various food products that are "hidden sources of gluten," each with a short explanation. <u>See</u> <u>id.</u> at 40-43. Hasselbeck finally lists several non-food products that contain gluten and directs the reader to a separate chapter

---

[11]<u>G Free</u> includes additional discussion of the gluten-free foods at pages 78 to 94.

discussing hygiene and beauty products.  <u>See</u> <u>id.</u> at 43-44.

Hasselbeck and Hassett, therefore, both incorporate some of the same facts into their works, but have, in general, selected and arranged their facts very differently.  Moreover, where both authors include explanatory text about a particular fact, the text is not similar.  <u>Compare</u> <u>Living</u> at 60-65, <u>with</u> <u>G Free</u> at 40-44. For this reason, any similarity relates to unprotected elements of <u>Living</u> and cannot justify a finding of substantial similarity.[12] <u>See</u> <u>DeBitetto</u>, 7 F. Supp. 2d at 334-35.

As another example, regarding a medical condition called Dermatitis Herpetiformis, Hassett writes:

> Dermatitis herpetiformis is a burning of the skin as well as a red itchy rash.  This rash is usually on the buttocks, elbows, knees, and face.  Some celiacs get this skin problem others do not.  It is said that only five percent of celiacs get it, of course I had to be one of those.  I only got the rash mostly on my face and occasionally on my elbows and maybe once on my knees.  It would burn so bad I would melt ten ice cubes on it and it will still burn.

<u>Living</u> at 45.  Hasselbeck, in her section captioned "Understanding Dermatitis Herpetiformis," writes:

> In his book <u>Celiac Disease: A Hidden Epidemic</u>, Dr. Peter Green describes dermatitis herpetiformis as "celiac disease of the skin."  In other words, dermatitis

---

[12]Another example of dissimilar factual arrangements can be found in the works' respective lists of helpful cooking terms. <u>Compare</u> <u>Living</u> at 57-59, <u>with</u> <u>G Free</u> at 132-33.  Out of 28 cooking terms listed in <u>Living</u>, only four are also included among the 33 terms listed in <u>G Free</u>.  The definitions of the terms at issue naturally describe similar facts, but are not identical or nearly so.

> herpetiformis is a form of gluten intolerance that
> manifests itself in the skin, in a pervasive, severe
> itchiness and blistering, particularly around the elbows,
> knees, and buttocks.  Like celiac disease, dermatitis
> herpetiformis is frequently misdiagnosed, often confused
> with eczema, psoriasis, or some other skin condition.
> Also like celiac disease, dermatitis herpetiformis has
> only one known treatement: a strict, gluten-free diet for
> life.

G Free at 24.  The only similarities between these passages are

medical facts - the fact that a condition called dermatitis

herpetiformis is associated with celiac disease, the fact that this

condition causes itching, and the fact that the condition often

occurs on the knees, elbows, and buttocks.  Beyond these

unprotected facts, the passages are not very similar.

     D.  Unprotected Selection and Ordering of Topics

     Hassett, in the exhibits to her complaint, also asserts that

there are similarities in the structure of the two books.  A review

of the two works reveals that any similarities are, in fact, minor.

While the books address some of the same topics, the order of

presentation is not identical or nearly so.  To the extent there is

any general similarity related to the selection and ordering of the

topics, the defendants' exhibits demonstrate that the general

sequence and topic selection of these works are customary to the

genre, see Snyder Decl. Ex. 30, and thus unprotected under the

doctrine of scenes a faire.  See Coquico, 562 F.3d at 68.

Moreover, courts have held that the general thematic ordering and

arrangement of a work is not usually copyrightable.  See LaPine,

2009 WL 2902584, at *9; see also Dunn, 517 F. Supp. 2d at 544 (holding that the claim that two works have substantial thematic and structural similarity "has little or no support in the law as a basis for a copyright claim").  To the extent there is any similarity between the structures of the two works, that similarity relates to unprotected elements of the works and does not support a finding of substantial similarity.

    E.  Compilation Copyright

    As a final matter, the theory of "compilation copyright" on which Hassett primarily relies is fundamentally flawed as a matter of law.  As clarified at the November 30, 2010 hearing, Hassett asserts that defendants extracted ideas, facts, and short pieces of text from Living, changed the text, and then dispersed this information throughout G Free in a new arrangement.  Hassett argues that this is impermissible because Hassett spent years compiling the information and ideas she included in Living.

    Accepting Hassett's view would essentially revive the "sweat of the brow" doctrine rejected by the Supreme Court in Feist.  See 499 U.S. at 359-60.  Hassett's labor in assembling Living, while commendable, does not entitle her to prevent others from using her facts and ideas in a subsequent work, provided that the expression and arrangement are sufficiently different.  See id. at 344-45. "The very same facts and ideas may be divorced from the context imposed by the author, and restated or reshuffled by second comers,

even if the author was the first to discover the facts or to propose the ideas." Id. at 349 (internal brackets and quotation marks omitted); see also Johnson, 409 F.3d at 25 (holding dissection analysis properly disposes of the case where "the components themselves are so dissimilar that they cannot sensibly be agglomerated in such a way as to conjure up an overall (legally significant) resemblance"). Here, as previously discussed, any facts and ideas arguably copied from Living have been thoroughly reshuffled and restated, and any lingering similarities arise out of individual words or short phrases excluded from protection.[13]

F.  Conclusion

When the unprotected portions of Living are removed from consideration, the remaining similarities are outweighed by the points of dissimilarity and are, in the context of the work, both qualitatively and quantitatively minimal. Indeed, although there is some overlap in subject matter, G Free and Living are very different books. Living is written in an informal style, emphasizes the hardships associated with celiac disease, and devotes almost 130 of its 249 pages to describing recipes for gluten-free cooking. G Free, on the other hand, is written in a more formal style, assumes a much more positive tone, and offers a

---

[13]As indicated earlier, defendants deny copying Hassett's work. For the purpose of deciding their motion for summary judgment, defendants recognize that it is appropriate for the court to assume, without finding, that such copying occurred.

total of four recipes comprising six pages of text.  See DeBitetto, 7 F. Supp. 2d at 335 (noting that stark differences in style, tone, and emphasis undercut the possibility of finding substantial similarity).

Accordingly, for all the foregoing reasons, a rational factfinder applying the correct legal standards would be compelled to find that no substantial similarity exists between Living and G Free.  See T-Peg, 459 F.3d at 112.  Therefore, summary judgment for defendants is appropriate.

V.   ORDER

In view of the foregoing, it is hereby ORDERED that:

1.  Defendants' Motion for Summary Judgment (Docket No. 33) is ALLOWED.  Judgment shall enter for defendants.

2.  All other pending motions are MOOT.


                           /s/ Mark L. Wolf
                      UNITED STATES DISTRICT JUDGE